UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| R.B., by and through her Guardian ad Litem, F.B., and F.B,<br><br>　　　　Plaintiff(s),<br><br>　v.<br><br>Napa Valley Unified School District,<br><br>　　　　Defendant. | No. C04-0094 BZ<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

On January 9, 2004, F.B., on behalf of herself and her child, R.B., sued the Napa Valley Unified School District ("the District") under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401, *et seq.*[1] Plaintiffs assert that R.B. was eligible for IDEA services for the 2001-02 and 2002-03 school years based on an emotional disturbance or other health impairment, and that the District failed to provide a free and appropriate

---

[1] The parties have consented to the jurisdiction of a United State Magistrate Judge for all proceedings including entry of final judgment pursuant to 28 U.S.C. § 636(c).

1

public education ("FAPE").  See 20 U.S.C. § 1401(3)(A),(8). They seek reimbursements in the amount of $140,643.00 for the cost of R.B.'s private placement at Intermountain Children's Home and Services ("Intermountain"),[2] $1,500 for an expert's assessment, and $3,000 paid to an educational consultant to locate Intermountain.  They also seek reasonable attorneys' fees and costs.  Now before me are the parties' cross motions for summary judgment.

The facts set forth in the administrative record are largely undisputed.  R.B. was born in May 1991, and as an infant was placed in foster care.  At one year of age, a neurologist evaluated her and found that she was having problems associated with exposure to illicit drugs in utero, including irritability, delayed visual maturation, central hypertonia, and delayed gross motor skills.  At eighteen months she was placed with F.B., a single mother, who subsequently adopted her.  At approximately two-and-a-half years of age, R.B.'s biological father allegedly sexually abused her during an unsupervised visit. Following the incident, she displayed severe emotional symptoms, including self-mutilation and inappropriate displays of affection.

In June 1994, she was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and was prescribed medication to treat her symptoms.  In September 1994, she

---

[2] This amount includes $118,000 that was paid by San Francisco Adoption Assistance, to which plaintiffs claim they are entitled because it is a resource no longer available to them.

2

was diagnosed with Reactive Attachment Disorder and Post Traumatic Stress Disorder ("PTSD").

R.B. was assessed in February and March 1996.  The assessment noted that R.B. had made significant progress, and did not demonstrate developmental delays in gross and fine motor skills, speech and language, self-help skills, and cognitive ability.  Her primary areas of difficulty remained in the "social and emotional domain."  The assessment concluded that although she had strong language skills and cognitive abilities, she nonetheless qualified for special education based on a learning disability, and an individualized education program ("IEP") was developed to address these issues.[3]

At the beginning of the 1997-98 school year, R.B.'s mother placed R.B. in private school, but within several months she returned to the District.  In January 1998, the District assessed R.B., and following an IEP meeting, concluded that she no longer qualified for special education services.  R.B.'s mother disagreed, and requested a reassessment.  Emily Jordan, Ph.D., a District psychologist, reassessed R.B.  In her evaluation, Dr. Jordan noted that R.B. was making excellent academic progress, and her difficulties maintaining interpersonal relationships were not adversely impacting her school performance.  Although the District concluded that R.B. did

---

[3] An "individualized education program" or "IEP" is a written statement for a child with a disability that is developed, reviewed, and revised in accordance with the procedures set forth in 20 U.S.C. § 1414(d)(1)(A).

3

not meet the criteria for either a learning disability or serious emotional disturbance, it developed an accommodation plan pursuant to section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("504 Plan"), to address R.B.'s ADHD, and a Classroom Behavioral Intervention Plan to address R.B.'s behavioral difficulties.[4]

During the 1998-99 and 1999-2000 school years, R.B. had several behavioral incidents at school, one of which resulted in a one-day suspension. During the 2001-02 school year, the first year at issue in this case, R.B. was suspended for a total of four-and-a-half days for twisting another child's arm during recess and for defiant behavior at recess and in class. On two occasions, the school called on local law enforcement to assist in removing her from the premises. She was also removed from her music class for several weeks after commenting that she hoped her music teacher would "die." R.B.'s behavioral difficulties were particularly pronounced during the second trimester of the 2001-02 school year. On February 22, 2002, the District implemented a Behavior Support Plan, and her behavior improved during the third trimester of the 2001-02 school year.

R.B.'s grades were consistently average to above average, and by the 2000-01 school year, her achievement

---

[4] Section 504 of the Rehabilitation Act prohibits federally-funded schools from discriminating against students on the basis of a disability. See 29 U.S.C. § 794.

4

test scores had increased to the 80th and 90th percentile. Her achievement test scores declined slightly during the 2001-02 school year, but remained average to above average. On a scale of one through five she received grades of four and five in all subjects. According to R.B.'s teacher, Joseph Silveira, although she was in fifth grade her vocabulary scores on one test placed her somewhere between an eighth and tenth grade level.

During the 2001-02 school year, R.B.'s mother contacted an educational consultant, and eventually retained Paula Solomon, Ph.D., a licensed psychologist and clinical director at a residential treatment center for emotionally disturbed adolescents. Dr. Solomon assessed R.B. in Spring 2002. In her evaluation, Dr. Solomon concluded that although R.B. made "significant academic progress each year, and is at average in most subjects, and above average in math, most of her academic skills are not at the level expected given her intelligence." Administrative Record ("A.R.") at Tab 29. She further stated that "public schools have been able to meet [R.B.'s] cognitive needs, but have repeatedly failed to address her emotional and behavioral needs." Id. Her diagnostic impression was that R.B. suffered from ADHD, intermittent explosive disorder, recurrent, moderate, early onset, major depressive disorder, and PTSD. Based on her assessment, she recommended that R.B. be placed in a residential treatment program.

On July 15, 2002, R.B.'s mother notified the District

1 that she intended to place R.B. in a residential program.
2 On August 6, 2002, she requested a due process hearing
3 pursuant to 20 U.S.C. § 1415(f)(1).[5]  On August 16 2002,
4 R.B.'s mother placed her in Intermountain, a private
5 residential treatment program located in Montana.  Denise
6 Struven, a District psychologist, assessed R.B. at
7 Intermountain in December 2002.  Struven concluded that
8 R.B. had superior intellectual ability; that her academic
9 skills tested at or above grade level; and that although
10 she had some difficulty with interpersonal relationships
11 and exhibited symptoms of depression, she did not meet the
12 relevant special education eligibility criteria.  On
13 January 31, 2003, the District held an IEP meeting, and the
14 IEP team determined that R.B. was not eligible for special
15 education.[6]

16     During the 2002-03 school year, R.B. attended
17 Intermountain.  At Intermountain, she exhibited some
18 inappropriate behavior, most of which appears to have
19 occurred outside of the classroom.  Her grades generally
20 remained average to above average.  She developed

---

[5] A parent may request an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement, of the child, or the provision of a free and appropriate public education to such child.  See 20 U.S.C. § 1415(b)(6),(f)(1); 34 C.F.R. § 300.507 *et seq*.

[6] The IEP team included Laura Miller, Director of Special Education, a special education teacher, Janis Sparks, Principal of Donaldson Way Elementary School and general education teacher, Denise Struven, Donna Poninski, both District psychologists, Sally J. Dutcher, an attorney for the District, and Jane F. Reid, plaintiffs' attorney. Tab 31.

6

1  relationships with Intermountain staff, including her
2  teacher, and began to make friends.
3     A due process hearing was held pursuant to 20 U.S.C. §
4  1415(f)(1) before a Hearing Officer for the California
5  Special Education Hearing Office ("the hearing officer")
6  over the course of six days in June and August 2003.  In a
7  sixteen-page written decision issued on October 15, 2003,
8  the hearing officer concluded that R.B. did not meet the
9  eligibility criteria for special education as a student
10 with an emotional disturbance and/or other health
11 impairment for either the 2001-02 or 2002-03 school year.
12 Based on this conclusion she determined that the District
13 was not required to provide special education or related
14 services; nor was R.B.'s mother entitled to reimbursement
15 for tuition at Intermountain.  Following the decision,
16 R.B.'s mother, on behalf of both herself and her child,
17 filed this complaint
18    In an IDEA action, the party challenging the hearing
19 officer's decision bears the burden of persuasion.  Clyde
20 K. v. Puyallap Sch. Dist. No. 3, 35 F.3d 1396, 1399 (9th
21 Cir. 1994).  The court shall receive the records of the
22 administrative proceedings; shall hear additional evidence
23 at the request of a party; and basing its decision on the
24 preponderance of the evidence, shall grant appropriate
25 relief.  20 U.S.C. § 1415(i)(2)(B).  Although judicial
26 review of state administrative proceedings under the IDEA
27 is less deferential than review of other agency actions,
28 Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th

7

Cir. 1993), "the provision that the reviewing court is to base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." <u>Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester County v. Rowley</u>, 458 U.S. 176, 206 (1982). "The amount of deference accorded the hearing officer's findings increases where they are thorough and careful." <u>Capistrano Unified Sch. Dist. v. Wartenberg</u>, 59 F.3d 884, 891 (9th Cir. 1995). After considering the hearing officer's findings carefully and endeavoring to respond to the hearing officer's resolution of each material issue, the court is "free to accept or reject the findings in part or in whole." <u>Capistrano Unified</u>, 59 F.3d at 891 (quoting <u>Gregory K. v. Longview Sch. Dist.</u>, 811 F.2d 1307, 1311 (9th Cir. 1987)). "When the court has before it all the evidence regarding the disputed issues, it may make a final judgment in what 'is not a true summary judgment procedure [but] a bench trial based on a stipulated record.'" <u>Miller ex rel. Miller v. San Mateo Foster City Unified Sch. Dist.</u>, 318 F. Supp. 2d 851, 859 (quoting <u>Ojai</u>, 4 F.3d at 1472).

    Plaintiffs challenge the District's determination that R.B. was not a child with a disability within the meaning of the IDEA during the 2001-02 and 2002-03 school years. A "child with a disability" means, among others, a child with a "serious emotional disturbance" or "other health impairment," who by reason thereof, "needs special

8

education and related services."[7]  See 20 U.S.C. §
1401(3)(A).  To qualify as an emotional disturbance or
other health impairment, the child's condition must
adversely affect her educational performance.[8]  34 C.F.R.
§§ 300.7(b)(4)(i)&(9); see also 5 Cal. Code of Reg. §
3030(i); J.D. v. Paulette Sch. Dis., 224 F.3d 60, 66-68
(2nd Cir. 2000); Katherine S. v. Umbach, 2002 WL 226697,
*11-12 (M.D. Ala. 2002).

　　　Plaintiffs argue that R.B. had a serious emotional
disturbance or other health impairment because she was
unable to maintain interpersonal relationships, exhibited
inappropriate behavior, had a general pervasive mood of
unhappiness or depression, and was diagnosed with ADHD.
They contend that R.B.'s condition occurred for a long
period of time to a marked degree and adversely affected
her educational performance.  They primarily rely upon the

---

[7]   "Special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including (i) Instruction conducted in the classroom, in the home, in hospitals, and institutions, and in other settings; and (ii) Instruction in physical education."  20 U.S.C. § 1401(25); 34 C.F.R. § 300.26.  "Related services" means "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(22).

[8]   If a child is determined to be eligible for special education services, the court must then determine whether the state complied with the procedures set forth in the IDEA, and second, whether the IEP developed for the child is "reasonably calculated to enable the child to receive education benefits." Rowley, 458 U.S. at 206-07.  In this case, the District determined that R.B. did not meet the eligibility criteria for a "child with a disability," and therefore it did not have an IEP in place for her during either of the years at issue.

9

1  testimony and reports of Dr. Solomon.  In their reply, they
2  also rely on the testimony of Tina Morrison, a psychologist
3  at Intermountain, and Kathy Brandt, R.B.'s special
4  education teacher at Intermountain.
5       Whether R.B. had a serious emotional disturbance or
6  other health impairment is a close question.  R.B. appears
7  to have been able to develop relationships with peers and
8  teachers.  See 34 C.F.R. § 300.7(b)(4)(B).  R.B.'s
9  behavioral problems occurred sporadically; her most severe
10 behavioral difficulties were confined to the second
11 trimester of her fifth grade year; and during this time she
12 was not consistently taking her ADHD medication.  See 34
13 C.F.R. § 300.7(b)(4)(C).  The hearing officer presided over
14 a six day hearing, and had the opportunity to judge the
15 credibility and demeanor of a number of witnesses.  Her
16 decision exceeds sixteen single-spaced pages, and is
17 thorough and careful.  See Capistrano, 59 F.3d at 891.  The
18 parties have not submitted any additional evidence.  Having
19 independently reviewed the record, and giving due deference
20 to the hearing officer, I agree with her finding that
21 plaintiffs have not established that R.B. had a serious
22 emotional disturbance or other health impairment within the
23 meaning of the IDEA.  See 20 U.S.C. § 1401(3)(A); 34 C.F.R.
24 § 300.7(b)(4)&(9).
25      Even if plaintiffs could establish that R.B.'s
26 condition met the criteria set forth in 34 C.F.R. §
27 300.7(d)(i)(B),(C) or (D), they have failed to show that it
28 adversely affected her educational performance during

either the 2001-02 or 2002-03 school year.  See 34 U.S.C. § 300.7.  They have also failed to demonstrate that R.B. needed "special education or related services."  See 20 U.S.C. § 1401(3)(A).  During the 2001-02 school year, R.B.'s most serious behavioral incidents occurred outside of school.  Although she also exhibited inappropriate behavior in school, the District had both a 504 Plan and a Classroom Behavioral Intervention Plan in place to address her ADHD and her behavior.  When her behavioral difficulties increased during the second trimester of the 2001-02 school year, culminating in a suspension on January 16, 2002, the District responded by developing a Behavior Support Plan.  R.B.'s behavior improved during the third trimester of the school year, and she returned to the honor roll.[9]

Plaintiffs' contention that R.B.'s potential was greater than what was reflected in her grades and test scores is unpersuasive.  The IDEA does not require the District to provide an education that maximizes the child's potential.  See Rowley, 458 U.S. at 189-90.  R.B. maintained above average grades, and her achievement tests were satisfactory or higher.  The only noted exception is the decline in her spelling achievement test score, which dropped from the 99th percentile to the 57th percentile.  This is still within the average range.  All of her other

---

[9] Although I could find no evidence of her return in the record, the District so contends, the hearing officer so found, and plaintiffs did not dispute this contention during argument.

11

scores remained average to above average. While R.B. was taken off of the honor roll briefly during the second trimester of the 2001-02 school year because of her behavior, her behavior improved during the third trimester, following the implementation of the Behavior Support Plan, and she returned to the honor roll.[10]

Plaintiffs rely heavily on Dr. Solomon's conclusion that R.B.'s behavior adversely affected her educational performance. As the hearing officer noted, Dr. Solomon did not observe R.B. in the classroom, or meet with her teachers. Dr. Solomon relied, in large part, on the mother's reports of school incidents, and did not perform the assessment for the purposes of determining "school functioning," or review R.B.'s grades in any detail. Her conclusions are contradicted by those of Struven, a District psychologist who observed R.B. in the classroom setting.

Plaintiffs' claim that the District admitted that R.B.'s behavior adversely affected her educational performance in the February 2002 Behavioral Support Plan is also unavailing. Although the Behavioral Support Plan indicated that R.B.'s behavior was impeding her learning, it is not clear to what extent. See A.R. at Tab 44. More importantly, the District implemented the plan to address R.B.'s behavior during the second trimester, and it appears to have been effective, as R.B.'s behavior improved during

---

[10] See fn. 9 supra.

the following trimester.  Even if it had not improved, these statements would still be insufficient to demonstrate that R.B. needed special education.  See 20 U.S.C. § 1401(3)(A).

Although R.B. appears to have had difficulties socializing with her peers, plaintiffs have not established that this adversely affected her educational performance or required special education or related services.  20 U.S.C. § 1401(3)(A); 34 C.F.R. § 300.7(d)(4)(i).  Silveira and Sparks both testified that they had good relationships with her and that she was friends with other students at school. Silveira attended one of her piano recitals, and a third grade teacher at the school invited R.B. to tutor her students in reading.  R.B. attended activities outside of school, and appears to have developed friends.  The hearing officer was particularly persuaded by the testimony of her teacher, the principal, and a family friend regarding R.B.'s interpersonal relationships.  Having independently reviewed the record, I agree with the hearing officer's conclusion that although R.B. appears to have some difficulty in social situations, she seemed to have been able to maintain satisfactory peer and teacher relationships.

Plaintiffs have also failed to establish that R.B. met the IDEA's eligibility criteria for the 2002-03 school year, when she attended Intermountain.  While R.B.'s behavioral difficulties increased at first, once she adjusted to her new environment, she began to develop

13

1  relationships with staff, her teacher, and other students.
2  Struven, who assessed R.B. in December 2002 also noted that
3  R.B.'s academic skills tested at or above grade level, and
4  concluded that although she had some difficulty with
5  interpersonal relationships and exhibited symptoms of
6  depression, she did not meet the criteria for special
7  education eligibility based on an emotional disturbance.
8  Morrison's testimony also confirms that many of her non-
9  school related behavioral difficulties, some of which also
10 manifested themselves in the school context, subsided.  As
11 Morrison noted, "She's connected a lot of her acting out
12 behaviors and problems in school to her anger at her mother
13 because she was a school teacher."  A.R. at Tab 133
14 (Morrison at 68).  This suggests that R.B. benefitted from
15 Intermountain in part because she was sheltered from the
16 problems she was having outside of school.[11]  In sum, R.B.'s
17 emotional and behavioral problems do not appear to have
18 substantially escalated during the 2002-03 school year, as
19 plaintiffs contend.

20      While R.B. had emotional and behavioral difficulties,
21 there is considerable dispute about the nature and gravity
22 of these problems.  The hearing officer, who is entitled to
23 some deference, concluded that they were not so serious as

---

[11]  While plaintiffs also rely on Seattle Sch. Dist. No. 1 v. B.S., 82 F.3d 1493 (9th Cir. 1996), that case is distinguishable.  Among other things, the record does not demonstrate that R.B.'s behavior was comparable to the severe emotional and behavioral disabilities at issue in that case, which required the student to be expelled from school and temporarily hospitalized in a psychiatric facility.  Id. at 1496.

14

1  to require special education.  See Capistrano, 59 F.3d at
2  891.  Having independently reviewed the record, I reach the
3  same conclusion as the hearing officer, and find that
4  plaintiffs have not met their burden of demonstrating,
5  based on a preponderance of the evidence, that R.B. was a
6  "child with a disability" within the meaning of the IDEA
7  during the 2001-02 and 2002-03 school years.  See 20 U.S.C.
8  §§ 1401(3)(A), 1415(i)(2)(B).

9       Plaintiffs also contend that the District committed a
10 procedural error by not including a regular and special
11 education teacher in the January 2003 IEP team.  The IDEA
12 requires that at least one regular education teacher be
13 included on an IEP team if the child is, or may be,
14 participating in the regular education environment.  20
15 U.S.C. § 1414(d)(1)(B); 34 C.F.R. § 300.344(a)(2).  This
16 duty is mandatory, not discretionary.  M.L. v. Federal Way
17 Sch. Dist., 394 F.3d 634, 643 (9th Cir. 2005).  The IDEA
18 also requires the IEP team to include "[a]t least one
19 special education teacher of the child, or if appropriate,
20 at least one special education provider of the child."  34
21 C.F.R. § 300.344(a)(3).  However, "[n]ot all procedural
22 flaws require a finding of denial of IDEA rights."  Ford
23 ex. Rel. Ford v. Long Beach Unif. Sch. Dist., 291 F.3d
24 1086, 1089 (9th Cir. 2002).  To determine whether a
25 procedural error denies a student's rights under the IDEA,
26 the court must examine whether it resulted in a loss of
27 ///
28 ///

educational opportunity.[12]  *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001); *W.G. Bd. of Trustees of Target Range Sch. Dist. No. 23, Missoula, Mont.*, 960 F.2d 1479, 1484 (9th Cir. 1992)).

The District does not dispute that Brandt, R.B.'s special education teacher at Intermountain, was not present at the January 31, 2003 IEP meeting.  R.B.'s mother and her attorney attended the January 31, 2003 meeting; neither objected to Brandt's absence.  Plaintiffs have also failed to establish that her absence resulted in a loss of educational opportunity.  At the time of the January 31, 2003 IEP, R.B. had been at Intermountain for approximately six months, and had only been in Brandt's class since November 2002.  While Brandt was not at the IEP meeting, Struven spoke with Brandt during her assessment of R.B. at Intermountain, and included this information in her evaluation.  Struven also reported her evaluation and observations of R.B. at Intermountain to the IEP team at the January 31, 2003 IEP meeting.  Plaintiffs have not pointed to specific evidence in the record nor have they made any additional evidentiary showing to support their

---

[12]  The Ninth Circuit recently reaffirmed that a regular education teacher must be included on the IEP team.  *See* *M.L.*, 394 F.3d 634.  Two of the three judges on that panel, relying on prior Ninth Circuit precedent, also noted that the omission of a regular education teacher should be examined under the harmless error standard, and the court should consider whether the procedural error resulted in a loss of educational opportunity.  *Id.* at 651, 662 (Gould, J., concurring in part, Clifton, J., dissenting) (citing *Shapiro*, 317 F.3d 1072; *Amanda J.*, 267 F.3d 877; *W.G.*, 960 F.2d 1479).

contention that omitting Brandt resulted in a deprivation of R.B.'s educational opportunity.  I therefore find that plaintiffs have failed to demonstrate how not including Brandt, who had been teaching R.B. for less than three months, resulted in a loss of educational opportunity.

Plaintiffs also contend that the District failed to include a regular education teacher of the child on the IEP team.  Again, neither plaintiffs' counsel nor R.B.'s mother objected.  In addition, Janis Sparks, R.B.'s kindergarten teacher and principal of Donaldson Way Elementary School, was on the IEP team.  While plaintiffs contend that the District should have included a regular education teacher from the middle, rather than the elementary school, they have cited no authority for this proposition.  R.B. had never attended the middle school.  Sparks was familiar with R.B. and her emotional and behavioral difficulties.  Plaintiffs have not shown that the absence of a teacher from the middle school resulted in a loss of educational opportunity.[13]

---

[13] Plaintiffs also contend that the IDEA required the District to evaluate R.B. prior to the end of the 2001-02 school year.  See 20 U.S.C. 1412(a)(3)(A).  The District did not overlook R.B.'s condition; it had both a 504 Plan and a Behavior Support Plan in place.  Plaintiffs do not dispute that R.B.'s mother did not request an assessment during the 2001-02 school year, or that R.B. was otherwise referred for such an assessment.  R.B.'s mother did not even notify the District of her intent to remove R.B. from the District until after the end of the school year.  Shortly thereafter, the District agreed to assess R.B.  Plaintiffs have not established that the District was required to assess R.B. prior to this date, and in any event, I have determined that R.B. did not meet the eligibility criteria under the IDEA during the 2001-02 school year.  See 20 U.S.C. §§ 1401, 1412(a)(3)(A); Clay T. v. Walton County Sch. Dist., 952 F.

A school district satisfies the IDEA "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Rowley, 458 U.S. at 203.  The record discloses the District did this during the relevant years by providing her with such support as a 504 Plan and a Behavior Support Plan.  R.B. benefitted educationally from these services as she consistently tested above the 70th percentile, save for one spelling test, and made progress in dealing with her behavioral problems, as when she worked her way out of the "rough patch" that was the second trimester of that year.

For the foregoing reasons, plaintiffs' motion for summary  judgment is denied, and defendant's motion is granted.  Accordingly, plaintiffs' request for reimbursement for the cost of the residential treatment program at Intermountain, for the cost of Dr. Solomon's assessment, and for the costs of the educational consultant is denied.  Judgment shall be entered in favor of defendant.

Dated:   June 2, 2005

　　　　　　　　　　　　　　　　/s/Bernard Zimmerman
　　　　　　　　　　　　　　　Bernard Zimmerman
　　　　　　　　　　　　　United States Magistrate Judge

G:\BZALL\-BZCASES\R.B\MSJ.wpd

---

Supp. 817, 823 (M.D. Ga. 1997).